UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

ERNEST ALLEN SUMMERS and BEVERLY
SUMMERS,

            Debtors.

_____/

Case No. DG 07-09716
Chapter 13
Hon. Scott W. Dales

## MEMORANDUM OF DECISION

This matter is before the court on the Petition for Allowance of Fees for Attorney (DN 59) as amended by the revised itemization (DN 76).  Cristopher A. Hogan seeks fees and expenses in the amount of $5,206.00 for invoices dating back to December 24, 2007 on account of services performed in the Debtors' second unsuccessful Chapter 13 proceeding.[1]  The revised fee itemization reduces the rates for Mr. Hogan and his assistant to $160 and $60 per hour, respectively (the "Revised Rate").

Debtors Ernest and Beverly Summers (the "Debtors"), now appearing *pro se*, objected to the fee petition, and the court conducted an evidentiary hearing over two days in Grand Rapids, Michigan.  This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

The court has subject matter jurisdiction under 28 U.S.C. § 1334(a), and may enter a final order in this core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

_____

[1] Fees incurred in the Debtors' first Chapter 13 case were not at issue. Mr. Hogan is seeking fees only for the second Chapter 13 case.

At the fee hearing, the court heard the testimony of James A. Yurgaites, a real estate appraiser; Elizabeth Clark, attorney for Brett Rodgers, Chapter 13 Trustee; Daniel Gunn, attorney for Fifth Third Bank (the "Bank"); Judy Johnson, legal assistant to Mr. Hogan; and Ernest A. Summers.   In addition, the court admitted 16 documents, including Exhibits 1, 3, 8, 12, 13, 15, 17, 18, 20, 21, 24, 28 and 32 that Mr. Hogan offered, and Exhibits A, H and I, that the Debtors offered.   The court also considered many of the documents the *pro se* Debtors used during the hearing, though the Debtors did not seek formal admission of the documents, and took judicial notice of the docket and the Bank's plan objection.   Fed. R. Evid. 201.   At the conclusion of the hearing, the court gave the parties an opportunity to seek admission of any documents previously discussed, but not formally offered for admission.

The proofs established that the Debtors' bankruptcy was not a routine Chapter 13 case mainly because they were attempting to restructure a commercial loan with the Bank in order to develop nine parcels of land as residential real estate. Save for a small amount of rental and retirement income, the Debtors did not have the resources to restructure the loan or apparently even fund a Chapter 13 plan, at least not after they lost a tenant.   Ultimately, the court dismissed the Debtors' first Chapter 13 case on the Trustee's motion, for failure to make regularly scheduled payments. This failure can be directly attributed to the Debtors and their financial circumstances, rather than their counsel and his office.

The Debtors filed a second Chapter 13 bankruptcy petition, again with Mr. Hogan as counsel, on December 28, 2007. Mainly through the testimony of Mr. Gunn, which the court credits, but also through the propounded documents, it is clear Mr. Hogan had

an extensive role in negotiations regarding the value of the Bank's collateral -- a key factor in any bankruptcy proceeding but especially important in this one, which depended heavily on real estate liquidation. Ms. Clark's testimony, also credible, corroborated the relatively complicated nature of Mr. Hogan's task, and the fact that the Debtors' proceeding was extraordinary in several respects, because of the Fifth Third Bank loans, the nine real estate parcels, the issue of cross-collateralization, and the Debtors' business income. Unlike most Chapter 13 cases, the facts of this one required Mr. Hogan to retain a commercial real estate agent with appraisal expertise, Mr. Yurgaites, in preparation for the negotiation with the Bank and a contested confirmation hearing.

From Mr. Summers's testimony, it appears he understood the costs and risks involved in retaining experts and relying on their testimony to establish property value, and concluded that he did not wish to continue with the confirmation hearing at which such evidence would be necessary. Nevertheless, Mr. Hogan, with the Debtors' acquiescence, evidently negotiated a resolution of the Bank's plan objection, and communicated the proposal to the Debtors in early October 2008. Ms. Clark testified that, by the time of the re-scheduled confirmation hearing, the Trustee had received the various documents he had been requesting, and with the resolution of the Fifth Third objection, the plan was ready for confirmation. Apparently, none of this made any difference to the Debtors, because they had once again failed to make plan payments and filed a Petition to Voluntarily Dismiss Chapter 13 Case on November 14, 2008. At the time of the dismissal of the second case, on December 3, 2008, the Chapter 13

3

Trustee's motion to dismiss reported the Debtors had failed to make $7,617.00 in pre-confirmation payments, contrary to 11 U.S.C. § 1326.

Under the circumstances, viewed from the perspective of the point in time the services were performed, the court finds that Mr. Hogan's fees and expenses were reasonable and necessary, and provided a benefit to the Debtors, even though the court ultimately dismissed their Chapter 13 case.  Under 11 U.S.C. § 330(a)(3)(C), the fact that the Debtors' plan failed is not dispositive, because, as noted above, the court evaluates the service "at the time at which the service was rendered."  At the time Mr. Hogan rendered services, it made sense to expend effort and money on Mr. Yurgaites's appraisal and hammer-out a stipulation for the treatment of the Bank's collateral.  The Debtors, after all, proposed a liquidating plan.  It also made sense to respond to the Trustee's requests for updated financial and other information.  This meant Mr. Hogan and his assistant, Ms. Johnson, justifiably spent time responding to the Trustee's and the Bank's requests and arguments in numerous telephone conferences and other exchanges.

Observing the demeanor of the parties, especially the Debtors' interaction with Ms. Johnson, it is clear everyone experienced difficulties communicating and trusting each other. This bred frustration on all sides, and perhaps contributed to the unhappy outcome of dismissal.  Ultimately, however, the case failed for non-payment, not for lack of effort on Mr. Hogan's part.

The court has independently and carefully reviewed the fee itemization, and considered the testimony of Ms. Johnson and Mr. Summers.  When undertaking this

review, the court is mindful of Judge Jonker's statement in In re Engman, 2009 WL 559873 (W.D. Mich.), that fee application litigation calls for a "dose of practicality" on the reviewer's part.

Although the original and amended itemizations were not flawless, Ms. Johnson offered plausible and credible testimony to explain various supposed discrepancies and overcharges. For example, although the court agrees with the Debtors that spending 24 minutes to forward a notice of a §341 meeting to the Debtors seems unreasonable at first blush, Ms. Johnson explained that, in addition to forwarding the court's notice, she routinely compiles and conveys case-specific information of utmost importance to debtors, such as details regarding the amount of pre-confirmation payments, deadlines for making such payments, documents specifically requested by the trustee, as well as information about decorum and attire for court appearances. Ms. Johnson's explanation satisfied the court's concerns in this regard.

Similarly, the court agrees with the Debtors that taking 24 minutes to electronically file a certificate of credit counseling seems excessive, but Ms. Johnson explained that the process required scanning paper copies of the certificates, one for each of the Debtors, and uploading the files to the court's electronic filing system. With a "dose of practicality," the court accepts the explanation.

The court also reiterates that the amended application reduces the rate charged for Mr. Hogan's and Ms. Johnson's time, and observes that the Revised Rates are in line with, and actually lower than, other rates the court routinely approves. Debtors' efforts to discredit Ms. Johnson's vocational education, by disparaging at least one

course provider as an online "diploma mill" did not detract from the testimony establishing her eleven years of experience in bankruptcy. As a general matter, cost-effective bankruptcy prosecution depends in large measure on experienced paraprofessionals, some with degrees, some without. Had Mr. Hogan performed many of the tasks that Ms. Johnson performed, the fees would have been even higher. The fee itemization reflected appropriate division of labor and supervision of Ms. Johnson, without smacking of double-dipping, to use Mr. Summers's term. By the same token, the court finds that Ms. Summers did not charge time for merely answering the phone, a task more properly treated as overhead. The court, therefore, rejects the Debtors' challenge to Ms. Johnson's Revised Rate, qualifications, and service. The court finds that the services Ms. Johnson performed fell squarely within those appropriately performed by a paralegal or legal assistant, and did not amount to the unauthorized practice of law or general overhead. At times this presents a difficult balance, and the court finds Ms. Johnson performed and billed appropriately.

Although Mr. Summers testified that he understood Mr. Hogan was charging a flat fee of $2,600.00 for the entire case, this understanding was not reasonable in light of the attorney fee disclosure Mr. Hogan filed with the court, and the Debtors signed, predicting they might incur additional fees for additional services, above the $2,600.00 initial fee. The court appreciates that the Debtors were under pressure or, in Mr. Summers's word, "duress," but this does not excuse their failure to read the disclosure statement before signing it. For his part, Mr. Hogan and his office might have done a better job of communicating with his clients, and thereby preventing their supposed surprise, but any shortcoming in this regard will not jeopardize his claim for

6

compensation because the fees were otherwise reasonable and necessary.[2]

Finally, the fee petition did not draw an objection from the Chapter 13 Trustee, who typically scrutinizes applications rather carefully, as Ms. Clark's credible testimony established.

The court has considered the Debtors' other challenges to the fee petition and finds they lack merit. Considering the totality of the testimony and other evidence, the court is satisfied that the application is proper. The court will approve it, as amended, in a separate order awarding Mr. Hogan $5,206.00 as requested.

Date: May 6, 2009

Scott W. Dales
United States Bankruptcy Judge

---

[2] Revealing a misunderstanding, Ms. Johnson testified that the Bankruptcy Code prevents law firms from billing Chapter 13 debtors for post-petition services. It is more accurate to say, however, that counsel may not collect fees without a court order, but nothing bars a lawyer from communicating with a client about litigation, including the transaction costs associated with litigation. In the court's view, there is a significant difference between invoicing a client and seeking to recover fees without court approval (which is of course forbidden), and keeping a client fully informed about the scope and costs of representation (which is only prudent).

7